**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO:  _____

**DIEGO DAMIAN VERDEJO,**
**ETERTIN, S.A.,**
**And IVEO LATINAMERICAN TRADING LLC,**

                            **JURY TRIAL DEMANDED**

        **Plaintiffs,**

**v.**

**HP INC.,**
**GONZALO GIAZITZIAN,**
**JUAN MANUEL CAMPOS,**
**CARLOS HUERGO,**
**JAVIER ALBERTO MAZZEO,**
**ERNESTO BLANCO,**
**and SERGIO VENIER,**

        **Defendants.**
_____/

## COMPLAINT FOR DAMAGES

Plaintiffs DIEGO DAMIAN VERDEJO, ETERTIN, S.A., and IVEO LATINAMERICAN TRADING LLC ("Plaintiffs") bring this civil action against Defendants HP INC., GONZALO GIAZITZIAN, JUAN MANUEL CAMPOS, CARLOS HUERGO, JAVIER ALBERTO MAZZEO, ERNESTO BLANCO and SERGIO VENIER pursuant to 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d) and Fla. Stat. §501.201, et. seq., to recover damages caused by Defendants' massive extortion scheme against Plaintiffs. In support of their claims, Plaintiffs allege as follows:

### NATURE OF THE ACTION

1.     This case concerns Defendant HP Inc.'s involvement in a years-long association with executives and former executives of its Argentine subsidiary, Hewlett- Packard Argentina, S.R.L. ("HP Argentina"), to threaten and extort Argentine distributors of HP Products and retaliate

against distributors who reported these and other illegal activities to keep other Argentine distributors of HP products in line for fear of similar treatment.

2.     On April 9, 2014, the Hewlett-Packard Company ("HP"), the predecessor company to Defendant HP Inc., paid $108 million to settle charges brought by the Securities and Exchange Commission and the U.S. Department of Justice for bribes the HP's subsidiaries and executives paid in Mexico, Russia, and Poland. HP paid fines of $72.4 million to resolve the DOJ criminal case. It also paid $29 million in disgorgement, including $26.47 million to the SEC and $2.53 million to satisfy an Internal Revenue Service forfeiture stemming from HP's payment of these bribes.

3.     HP admitted that its subsidiary in Mexico used intermediaries to pay bribes to officials at Petroléos Mexicanos ("Pemex"), Mexico's state-owned oil and gas company, to win a $6 million software contract, and that the subsidiary's books and records falsely reflected the payments, thus causing HP's books and records to be falsified.   *See* Apr. 9, 2014 Non-Prosecution Agreement, available at https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2014/04/10/hp-mexico-npa.pdf. HP's subsidiary in Poland gave gifts and cash bribes to a government official to win contracts with the national police agency. *See* Apr. 9, 2014 DOJ Press Release, available at https://www.justice.gov/opa/pr/hewlett-packard-russia-agrees-plead-guilty-foreign-bribery. HP's subsidiary in Russia pleaded guilty to a scheme to bribe officials involving the creation of a secret "slush fund" and the creation of inflated commissions to intermediaries to fund the bribe payments. *Id.*

4.     On the date the settlement with the Government was announced, HP put out a press release in which John Schultz, the then-executive vice president and general counsel of the company stated: "The misconduct described in the settlement was limited to a small number of

people who are no longer employed by the company.  HP fully cooperated with both the Department of Justice and the Securities and Exchange Commission in the investigation of these matters and will continue to provide customers around the world with top quality products and services without interruption." *See* April 9, 2014 press release available at: https://www8.hp.com/us/en/hp-news/press-release.html?id=1624050.

5.      As part of the global settlement of the claims involving its subsidiaries, HP signed a non-prosecution agreement with DOJ premised, in part, on HP's "commitment to enhancing their compliance programs and internal controls" and its "agreement to continue to cooperate with the Department in any ongoing investigation of the conduct of the Company and its officers, directors, employees, agents, and consultants relating to violations of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1 *et seq*." *See* Apr. 9, 2014 Non-Prosecution Agreement, available at https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2014/04/10/hp-mexico-npa.pdf.

6.      As set forth below, HP failed to enhance its compliance programs and internal controls to detect and prevent the widespread extortion of Argentine distributors of HP products. Indeed, HP Inc. took steps to encourage the illegal extortion payments and retaliated against Argentine distributors who refused to continue to pay.

7.      Defendant HP Inc. learned about the extortion scheme at least as early as July 2017. Instead of ending it and disciplining the individuals involved in the extortion, HP Inc. allowed it to continue. Moreover, it retaliated against Plaintiff Diego Damian Verdejo and his company, Plaintiff Etertin S.A., for reporting the extortion by withholding credit notes essential to Etertin S.A.'s continued profitable sales of HP Inc. products in Argentina. HP Inc. understood that Etertin S.A., then a distributor of HP products in Argentina, would suffer financial losses without the

credit notes, and that withholding the credit notes would force Etertin to succumb to the demands of the HP Argentina executives and (by that time) former HP executives, and resume the extortionate payments.  The retaliation also had the intended effect of keeping other Argentine distributors of HP products in line out of fear of similar treatment.

8.      At all times relevant to the allegations herein, Plaintiff Diego Damian Verdejo ("Verdejo") owns and operates Etertin S.A. ("Etertin"), a company based in Argentina engaged in the business of wholesale distribution of office supplies.

9.      Etertin is an Argentine company that has been in business since 1960.

10.     Since 1995, Etertin has been a key distributor of HP products in Argentina.

11.     Verdejo and his employees have had long standing business relationships with key officials at HP USA's Argentine subsidiary, Hewlett- Packard Argentina, S.R.L. ("HP Argentina").

12.     To keep doing business with HP and HP Argentina, HP Argentina senior executives in 2011 demanded that Verdejo make direct payments to them, first in Argentina, and later, starting in February 2017, in the United States. HP Argentina executives also demanded that Verdejo turn over a portion of the ownership interest in Etertin to the executives.

13.     Former HP Argentina executive Gonzalo Giazitzian extracted payments from Verdejo and other individuals and companies by threatening to cut off the companies' access to HP products if the payments were not made. At least two other companies in Argentina, Intermaco, S.R.L. and Elite, S.A., were similarly forced to pay money to Giazitzian and other HP Argentina executives.

14.     Beginning in February 2017, Iveo Latinamerican Trading LLC, a Florida corporation controlled by Verdejo, was forced to make several wire transfers consisting of hundreds of thousands of dollars from its Miami-based bank account to a New York-based bank

account owned by Gonzalo Giazitzian. Giazitzian then distributed this money to himself and other current and former HP Argentina executives, including Juan Campos, General Manager of HP Argentina, Carlos Huergo, former General Manager of HP Argentina, Ernesto Blanco, then-Corporate Manager at HP Argentina, Javier Alberto Mazzeo, then-Marketing Director at HP Argentina, and Sergio Venier, then-Supplies Business Manager at HP Argentina.

15.    From 2012 until it suspended operations in 2019, Etertin maintained and conducted business in the Southern District of Florida. During this period, Etertin paid logistics companies for use of a warehouse in Miami-Dade County, Florida to receive HP products it would purchase from HP, and, after HP split into two companies on November 1, 2015, from HP's successor company, HP, Inc ("HP/HP Inc."). HP/HP Inc. would ship products to Etertin's Florida warehouse, and then Etertin would import the products into Argentina. Etertin would then pay HP/HP Inc. in the United States for the products it bought, and used credits HP/HP Inc. issued to Etertin to reduce the sales price for the products.

16.    From 2012 until it suspended operations in 2019, Etertin would determine the amounts owed to HP/HP Inc. using an online computer portal maintained by HP/HP Inc. which showed the balance due to HP/HP Inc., factoring in both the prices of HP products and the credit notes that Etertin had at its disposal to reduce those prices.

17.    In June 2017, Verdejo notified Defendant Juan Campos, one of the recipients of the extortion payments and the General Manager of HP Argentina, that he would no longer provide any more extortion payments. HP Inc., Campos, and others retaliated by withdrawing and withholding the issuance of millions of dollars' worth of credit notes. These credit notes, which had been previously available to Etertin for years before the retaliation, effectively served as a

credit in Etertin's account with HP Inc. that reduced the amount of money Etertin had to pay HP Inc. in the United States for HP Inc. products delivered to Etertin's warehouse in Miami, Florida.

18.     Verdejo notified officials in HP Inc. of the extortionate payments and demanded that HP Inc. restore Etertin's credit notes.  HP Inc.'s refusal to restore the credit notes had the intended effect of forcing Etertin to send HP Inc. more money to the United States to purchase HP Inc.'s products. Over time, Etertin could no longer afford to pay the inflated, retaliatory prices for HP Inc. products and was essentially forced from being a supplier of HP products in Argentina and, ultimately, into bankruptcy.

## **JURISDICTION AND VENUE**

19.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20.     The Court has general personal jurisdiction over Defendant HP Inc., which maintained a physical office at 5200 Blue Lagoon Drive in Miami, Florida during the extortive conduct described herein. HP Inc., doing business in the State of Florida as HP Computing and Printing Inc., currently conducts business within the Southern District of Florida and, according to its 2020 annual report filed with the State of Florida, currently maintains an agent in this District. HP Inc. and Gonzalo Giazitzian also had sufficient minimum contacts with the forum, and Plaintiffs' claims arise from those contacts so that the exercise of specific personal jurisdiction is also consistent with due process. While it is unknown at this time whether Defendants Juan Manuel Campos, Javier Alberto Mazzeo, Ernesto Blanco, or Sergio Venier have sufficient minimum

contacts with the forum, this Court may exercise personal jurisdiction over them as co-conspirators.

21.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

22.    Plaintiff Diego Damian Verdejo, an individual, is the owner and Chief Executive Officer of Etertin S.A., and has been the owner and Chief Executive Officer of Etertin S.A. at all times relevant to this Complaint. He is an Argentine citizen and is a resident of Buenos Aires, Argentina.

23.    Plaintiff Etertin S.A. is a corporation organized under the laws of Argentina with its headquarters in Buenos Aires, Argentina. At all times relevant to this Complaint, Etertin S.A. engaged in the business of wholesale distribution of office supplies and equipment, including office supplies and equipment manufactured by HP and later Defendant HP Inc.

24.    Plaintiff Iveo Latinamerican Trading LLC is a Florida corporation formed on August 29, 2012 and voluntarily dissolved on August 17, 2018. At least as of February 2017, Plaintiff Verdejo controlled Iveo Latinamerican Trading LLC, and caused it to wire transfer hundreds of thousands of dollars of extortionate payments from a bank account it maintained in the Southern District of Florida to a bank accounts in New York owned by Defendant Gonzalo Giazitzian.

25.    At all times relevant to this Complaint until on or about November 1, 2015, Hewlett-Packard Company and all of its direct or indirect affiliates or subsidiaries (collectively, "HP") was a technology company headquartered in Palo Alto, California, and incorporated in Delaware. HP was a global provider of personal computing devices, information technology

infrastructure, and imaging and printing products and services. HP employed more than 300,000 employees worldwide.

26.     On or about November 1, 2015, HP split into two companies. HP spun off a new publicly traded company, Hewlett Packard Enterprise Company, which consisted of HP's information technology infrastructure and business services divisions. The remainder of HP's divisions, including its personal computing device and imaging and printing products and services divisions, remained, and was renamed HP Inc. Defendant HP Inc. retained HP's stock ticker symbol and stock price history.

27.     HP, and later, Defendant HP Inc., maintained a physical office at 5200 Blue Lagoon Drive in Miami, Florida during the extortive conduct described herein. HP Inc., doing business in the State of Florida as HP Computing and Printing Inc., currently conducts business within the Southern District of Florida and, according to its 2020 annual report filed with the State of Florida, currently maintains an agent in this District.

28.     Defendant Gonzalo Giazitzian, an individual, was the Supplies Partner Manager for HP Argentina from at least as early as 2012 until he left HP Argentina in or around April 2016. Giazitzian is an Argentine citizen who resides in Buenos Aires, Argentina. Giazitzian maintains a private bank account in the United States that recently contained substantial assets.

29.     Defendant Juan Manuel Campos, an individual, was the General Manager for HP Argentina from September 2015 to September 2019, when he was promoted to become the General Manager of HP Peru, where he manages HP's affairs in Peru, Ecuador, and Bolivia. Campos is an Argentine citizen who resides in Buenos Aires, Argentina. Campos maintains a private bank account in the United States and is the beneficiary of special bank accounts in the Cayman Islands and New Zealand that recently contained substantial assets.

30.     Defendant Carlos Huergo, an individual, was the former General Manager for HP Argentina from May 2002 until July 2012. Huergo is an Argentine citizen who resides in Buenos Aires, Argentina. Huergo controls two bank accounts in the United States that recently contained substantial assets.

31.     Defendant Javier Alberto Mazzeo, an individual, was the Marketing Director for HP Argentina from 1996 until April 2013. Mazzeo is an Argentine citizen who is believed to reside in Montevideo, Uruguay.

32.     Defendant Ernesto Blanco, an individual, has been the Corporate Accounts Manager for HP Argentina from September 2013 to the present. Blanco is an Argentine citizen who resides in Buenos Aires, Argentina. Blanco maintains private bank accounts in the United States and the United Kingdom that recently contained substantial assets.

33.     Defendant Sergio Venier, an individual, was a Supplies Business Developer for HP Argentina from June 2015 until July 2018. Venier is an Argentine citizen who resides in Buenos Aires, Argentina.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### Background to Extortion Scheme

34.     Starting in or around 1995, Plaintiff Etertin became a distributor in Argentina of HP products, including printers, ink, and toners.

35.     To become a distributor in Argentina, Etertin signed distribution agreements both with HP and HP Argentina.

36.     Before 2005, HP provided Etertin and similarly situated Argentine distributors a minimum price for products to which distributors could add a profit margin, but in 2005, HP altered its pricing structure and quoted its distributors a set price for its products.

37.     Under HP's new pricing structure, HP established a "current list price" and then provided Etertin and similarly situated Argentine distributors a "purchase agreement discount rate.".

38.     Beginning in 2005, HP would also provide Etertin and similarly situated Argentine distributors "credit notes" which the distributors would use to reduce the amount of money they would owe HP for HP products.

39.     Beginning in 2011, HP increased the quantity of credit notes to Etertin and similarly situated Argentine distributors. These credit notes sufficiently defrayed the cost of HP products to Argentine distributors so that the distributors could sell HP products in Argentina at a profit.

40.     Without the credit notes, Etertin and the other Argentine distributors could not sell HP products in Argentina with any profit margin. Any reduction of credit notes to one distributor would cripple its ability to sell HP products in Argentina because the distributor would be unable to compete with the distributors who were still receiving the full complement of credit notes from HP/ HP Inc.

41.     Until 2012, HP Argentina would import the HP products it sold to Etertin and similarly situated Argentine distributors of HP products, often from the United States into Argentina, and HP Argentina bore all risks of shipping. To obtain HP products, the distributors would place an order with HP Argentina and pay HP Argentina for the products it obtained within a certain period after delivery of the products to the distributors' warehouses.

42.     In 2012, HP changed the method by which distributors obtained HP products in Argentina. From 2012 until 2019, Etertin ordered HP products in the United States by placing an order on a computer portal maintained in the United States by HP/HP Inc. Etertin would arrange for HP/HP Inc. to ship ordered product to warehouses in Miami-Dade County that Etertin paid to

use. *See*, *e.g.*, Exh. H (Warehouse Receipt from Jun. 13, 2018 showing warehouse destination in Miami, Florida).

43.      Throughout the period of 2012 to 2019, the value of the credit notes issued by HP/HP Inc. was applied to, and reduced, the outstanding balances Etertin owed HP/HP Inc. for the purchase of HP products.  Throughout this period, HP/HP Inc. maintained the value of the credit notes in the United States.

44.      Throughout the period of 2012 to 2019, Etertin would use an online portal that HP/HP Inc. maintained in the United States to view the cost of the products it ordered and the applicable credit notes at Etertin's disposal to reduce the amount Etertin owed HP/HP Inc.  Etertin would then pay for the HP products by sending a wire transfer to HP's/HP Inc.'s bank accounts in the United States. *See* Exh. I (Wire Tr. Instructions, Apr. 17, 2017)

45.      Over the years, Etertin sold tens of millions of dollars' worth of HP products in Argentina and HP Argentina awarded Etertin numerous awards as a top distributor in Argentina, most recently HP Argentina's 2015 award for "best distributor overall." Exh. G, Photo showing Defendant Juan Manuel Campos and Etertin executives and employees.

**Origin of Extortion Scheme**

46.      In or around October 2010, Verdejo was summoned by Defendant Gonzalo Giazitzian to a meeting in HP Argentina's offices in Buenos Aires, Argentina. At the meeting, HP Argentina executives Defendants Carlos Huergo and Javier Mazzeo demanded that Verdejo pay them a portion of some of the credit notes that Plaintiff Etertin would receive from HP or else Etertin would lose its ability to distribute HP products in Argentina. Verdejo refused to accede to this extortive demand.

47.     Shortly thereafter, in or about January 2011, individuals broke into Etertin's office in Buenos Aires and either stole or damaged about 80% of Etertin's merchandise, costing Etertin a loss of approximately $1.8 million dollars. Because of the robbery, Etertin's dire financial straits forced Etertin's remaining shareholders, other than Verdejo, to leave the company.

48.     Shortly after the robbery, Giazitzian approached Verdejo again and explained that he and others at HP Argentina would "fix" the issues caused by the robbery if Verdejo agreed to Giazitzian's demands: (1) Verdejo would pay Giazitzian and other HP Argentina executives a portion of some of the credit notes that HP provided to Etertin going forward, and (2) Verdejo would agree to make Giazitzian a 33% beneficial owner of Etertin. Giazitzian made it clear to Verdejo that if Verdejo did not agree to these demands, Etertin's status as a distributor of HP products would be revoked. Verdejo had no choice but to agree to Giazitzian's demands or face financial ruin.

49.     Beginning in or about April 2011, Etertin and Verdejo began making various payments to Giazitzian representing Giazitzian's and other HP Argentina officials' share of a portion of the value of credit notes Etertin received from HP, an amount that increased over time. Etertin and Verdejo continued making such payments to Giazitzian through 2017 and, as detailed below, eventually began making the extortionate payments to Giazitzian in the United States in February 2017.

50.     Giazitzian shared these payments with other executives at HP Argentina. *See, e.g.,* Exh. A, Nov. 3, 2015 email from G. Giazitzian to D. Verdejo, I. Sarachaga, describing amounts of settlement payment as well as the separate payment on credit notes to "Sergiote" (Sergio Venier).

**Scope of Extortion Payments**

51.     Etertin was not Giazitzian's and the other HP Argentina executives' only extortion target; at least two other companies in Argentina, Intermaco, S.R.L. and Elite, S.A., were similarly forced to pay money to Giazitzian and other HP Argentina executives. *See, e.g.,* Exh. B, Sept. 23, 2014 email from Giazitzian to Etertin and Intermaco, mentioning portion of payments required by Intermaco.

52.     Giazitzian communicated to Plaintiffs the consequences that would befall them for failing to pay. On at least one occasion in 2012, Giazitzian forwarded a complaint by an Argentine distributor about his lack of access to the credit notes to demonstrate to Verdejo why Verdejo needed to continue to pay the extortionate payments. *See, e.g.,* Exh. C, Sep. 21, 2012 E-mail from Giazitzian to Verdejo.

53.     In or around April 2016, Giazitzian left his position at HP Argentina. Giazitzian informed Verdejo that, after discussion with the HP Argentina executives receiving the credit note payments, it was decided that Giazitzian would continue to collect the extortion payments from Etertin and Verdejo with the assistance of his HP Argentina replacement, Sergio Venier, and others.

54.     Even after Giazitzian left HP Argentina, Giazitzian continued to demand and collect payment from Etertin and Giazitzian continued to share these payments with executives at HP Argentina, including Campos, Huergo, Mazzeo, Blanco, and Venier.

55.     Giazitzian would send periodic emails to Etertin from his personal email address providing a breakdown of the payments owed that period. In one such email dated June 1, 2015, Giazitzian attached a spreadsheet showing a required payment of 1,031,698 Argentine pesos and instructed Verdejo and an Etertin employee named Ignacio Sarachaga to convert the funds into

dollars and that an individual named "Juan Carlos" would pick up the funds "at the Financial Entity." Exh. D, Jun. 1, 2015 email from G. Giazitzian to D. Verdejo, I. Sarachaga.

56.     Giazitzian would also send communications instructing Verdejo to postpone the extortionate payments to him if there was a pending obligation to HP/HP Inc. or demand Verdejo immediately pay pending extortion payments that Verdejo wanted to postpone until later.

57.     Giazitzian demonstrated the influence he still wielded at HP Argentina by arranging for Etertin to obtain HP distribution rights over other distributors in Argentina and by forwarding internal HP emails to Verdejo to show his continued influence at HP Argentina. For example, on May 15, 2017, Giazitzian forwarded to Etertin an internal HP email chain regarding distribution rights, along with information relating to HP's Argentine distributors. Giazitzian sent this information to remind Etertin and Verdejo why they needed to continue to make the extortion payments to keep distributing HP products in Argentina. *See* Exh. E, May 15, 2017 e-mail from G. Giazitzian to D. Verdejo.

### Extortionate Payments in the United States

58.     By 2017, Verdejo understood from both speaking with Giazitzian and emails and text messages exchanged with Giazitzian that the extortion payments he was making to Giazitzian were being shared with Defendants Campos, Huergo, Mazzeo, Blanco, and Venier.

59.     Before February 2017, Giazitzian made extortionate demands to Etertin and Verdejo while Giazitzian was in the state of Florida.

60.     For example, in April 2014, Giazitzian and Verdejo traveled from Argentina to Florida. *See* Exh. F, Apr. 28, 2014 Travel Reservations. While in the Southern District of Florida, Giazitzian visited the offices of Plaintiff IVEO Latinamerican Trading LLC.

61.     While in Florida, Giazitzian continued to demand payments from Verdejo and Etertin and reminded Verdejo that without such payments, wholesalers such as Etertin would become bankrupt.

62.     Giazitzian traveled to Florida from Argentina with the specific intent to illegally demand extortionate payments from Verdejo.

63.     In December 2014, Giazitzian, Verdejo, and the owner of Intermaco, Esteban Isorna, traveled to Miami, Florida from Argentina. While in Florida, Giazitzian demanded payments from both Verdejo and Isorna on behalf of their companies, Etertin and Intermaco, respectively.

64.     Giazitzian traveled to Florida from Argentina with the specific intent to illegally demand extortionate payments from Verdejo and Isorna.

65.     Then from December 2015 until January 2016, Giazitzian was in the Southern District of Florida. While in Florida, Giazitzian called Verdejo to demand extortionate payments.

66.     Giazitzian traveled to Florida from Argentina with the specific intent to illegally demand extortionate payments from Verdejo.

67.     Before February 2017, Giazitzian did not demand that the extortionate payments be made in the United States. On February 3, 2017, Giazitzian instructed Etertin to wire the extortionate payments to a bank account Giazitzian maintained in New York, New York.

68.     Verdejo used a bank account belonging to Plaintiff IVEO Latinamerican Trading LLC, a company he then controlled, to accede to Giazitzian's extortionate demands for payment in the United States.

69.     On or about February 10, 2017, at Giazitzian's instruction, Verdejo caused a payment of $105,000.00 in United States dollars to be sent by wire transfer from a Miami, Florida-

based bank account belonging to Plaintiff IVEO Latinamerican Trading LLC to a Morgan Stanley Smith Barney bank account based in New York belonging to Giazitzian.

70. On or about March 16, 2017, again at Giazitzian's instruction, Verdejo caused another payment of $105,000.00 in United States dollars to be sent by wire transfer from a Miami, Florida-based bank account belonging to Plaintiff IVEO Latinamerican Trading LLC to a Morgan Stanley Smith Barney bank account based in New York belonging to Giazitzian.

71. On or about May 1, 2017, again at Giazitzian's instruction, Verdejo caused another payment of $105,000.00 in United States dollars to be sent by wire transfer from a Miami, Florida-based bank account belonging to Plaintiff IVEO Latinamerican Trading LLC to a Morgan Stanley Smith Barney bank account based in New York belonging to Giazitzian.

72. On or about June 2, 2017, June 9, 2017, June 19, 2017, and June 22, 2017, again at Giazitzian's instruction, Verdejo caused four separate payments of $24,800 in United States dollars, totaling $99,200 in United States dollars to be sent by wire transfer from a Miami, Florida-based bank account belonging to Plaintiff IVEO Latinamerican Trading LLC to a Morgan Stanley Smith Barney bank account based in New York belonging to Giazitzian.

73. In total, at Giazitzian's instruction, Verdejo caused $414,200 in United States dollars in extortion payments to be wire transferred from a Miami, Florida-based bank account belonging to Plaintiff IVEO Latinamerican Trading LLC to a Morgan Stanley Smith Barney bank account based in New York belonging to Giazitzian.

74. Giazitzian then distributed the proceeds in his New York-based account to the other Individual Defendants through monetary transactions, knowing that the proceeds were the proceeds of unlawful extortion.

75.     The Individual Defendants agreed to, and did receive these proceeds, knowing that they were the proceeds of unlawful extortion.

76.     In all the instances described above where Plaintiffs provided money to Giazitzian based on Giazitzian's demands for payment, Plaintiffs consented to provide the money based on Giazitzian's or the Individual Defendants' wrongful use of threats which placed Plaintiff Verdejo in fear of financial loss of the HP business if he did not comply.

**Complaints to HP, Inc.'s Global Ethics and Compliance Officer Resulted in Retaliation**

77.     In or around June 2017, having paid approximately $14 million United States dollars to Giazitzian and other HP Argentina executives, Verdejo made multiple demands to HP Argentina's General Manager, Juan Manuel Campos, asking him to stop the extortion requests and to elevate Verdejo's concerns to HP Inc.'s compliance department.

78.     On or about June 26, 2017, Verdejo met with Campos in Buenos Aires and tried to provide him with a packet of evidence proving the extortion payments. Campos refused to accept the packet from Verdejo.

79.     Following the meeting, Sergio Venier conveyed to Etertin's General Manager, Andres Bordaberry, that he had learned of Verdejo's meeting with Campos and that HP would be cutting off Etertin's line of credit if Etertin did not continue to pay.

80.     Rather than stop the conduct, Campos caused HP Inc. to retaliate against Etertin by causing HP Inc. to withhold the credit notes for HP products that Etertin needed to compete with other HP distributors.

81.     HP Inc. had no reason to withhold the credit notes other than to retaliate for Verdejo's decision not to continue the extortion payments. Indeed, less than 18 months earlier, HP

Argentina had awarded Etertin "best distributor overall for 2015 Argentina." Exh G, Photo showing Defendant Juan Manuel Campos and Etertin executives and employees.

82.    In July 2017, Verdejo communicated directly with HP Inc. in the United States to notify HP Inc. about the extortion. On or about July 27, 2017, an HP Inc. investigator responded to Verdejo's complaint and sent Verdejo several questions about, among other things, the scope of the extortionate conduct, the length of time the conduct had been carried out, and the identities of the individuals involved.

83.    Verdejo responded by email on or about August 1, 2017, seeking, among other things, a guarantee "of full confidentiality" in connection with the investigation.

84.    On or about August 1, 2017, the HP Inc. investigator replied that he "referred your requirements to speak to us to HP Legal."

85.    Etertin retained the services of a United States-based attorney, and on August 15, 2017, that attorney sent a letter to Kim Rivera, HP Inc.'s Chief Legal Officer and General Counsel, explaining how Etertin had "recently reported criminal activity (including extortion, fraud, tax evasion and money laundering) by your wholly-owned Argentine subsidiary," and that since making the report, "Etertin was informed (orally) by a representative for HP Argentina that HP Argentina would no longer extend Etertin existing credit terms" and that Etertin "understandably regards this change in credit terms as retaliation for making an ethics complaint, and I am writing to request that you intercede to reverse this retaliation immediately."

86.    On or about October 4. 2017, Etertin's U.S.-based attorney spoke with an HP Inc. employee named Wilson Leung to confirm that an "OPG" credit note that HP Inc. had provided to Etertin was used to reduce the price of HP products Etertin had purchased.

87.     On or about October 6, 2017, Etertin's U.S.-based attorney corresponded with Leung by email and confirmed that the OPG credit note (worth $301,345) did in fact work, although, she noted, Etertin "still lost money – approximately $250,000—due to the delayed issuance." The attorney also expressed a desire to set up an in-person meeting with HP executives in California in November.

88.     On or about October 12, 2017, Leung responded to the attorney by email and explained that he could find "no reason why Etertin would be precluded from seeking the discounts it had before . . .we found no bar to seeking the discounts." Leung also expressed a desire to meet and have a telephone call in the interim.

89.     As the attorney and Leung attempted to schedule a meeting, on or about November 1, 2017, HP Inc.'s Ethics and Investigations Counsel, Gina Kim Sumilas informed the attorney that Leung had "left HP" and that she (Sumilas) was now "handling this matter."

90.     The attorney and Sumilas ultimately scheduled a meeting in San Francisco, California on or about November 28, 2017. Participating in the meeting were Verdejo, other Etertin executives and attorneys, and other HP Inc. officials and attorneys. HP Inc.'s investigators questioned Verdejo about the allegations of extortion and other criminal acts, and Etertin's attorneys showed HP Inc.'s attorneys several documents corroborating Verdejo's account.

91.     Following the meeting, Etertin's U.S.-based attorney corresponded with HP Inc.'s attorney and provided the latter with documents corroborating Verdejo's account.

92.     Nevertheless, the retaliation continued unabated. HP Inc. and the Individual Defendants continued to retaliate against Etertin for complaining about the extortionate and other illegal conduct Etertin suffered at the hands of HP Argentina's current and former employees.

93.     On or about December 4, 2017, Etertin sent HP Argentina an official telegram, detailing the extortionate conduct and noting that, as a result of the complaint, "Mr. Juan Campos / HP, far from modifying the situation, displacing corrupt officials, ordering and making things transparent, only started, or was conducive to, a campaign to discredit Etertin in the market, added the lack of attention from day-to-day business on a regular basis, seriously hindering them, added to the radical change in the commercial conditions that Etertin had established for years." The telegram noted that, separate from the extortionate conduct, HP Argentina had violated HP policy by demanding bribes and returns in exchange for offering discounts and other favorable trade terms and falsifying books and records to hide illegal and unethical activities . . . it is clear that HP USA has violated the FCPA standards in the past (Foreign Corrupt Practices Act), there exist an almost recent history of conviction (subsidiaries of Russia – Mexico), without prejudice in this case we hope that this type of conduct has been left in the past and that HP decides to act in accordance with the current regulations applicable in Argentina and to its parent company in the United States."

94.     On or about December 20, 2017, HP Argentina denied the allegations in a telegram sent back to Etertin.

95.     Over the next several months, Etertin and HP Argentina exchanged telegrams about the retaliation, but HP Inc. refused to provide Etertin the credit notes it had withdrawn and withheld to punish Plaintiffs Verdejo and Etertin for reporting the extortion and other illegal activities.

96.     HP Inc.'s credit notes to Etertin dwindled from an average of $960,718 in United States dollars in the ten fiscal quarters immediately preceding the quarter in which Verdejo first complained to Campos to $279,632 in the quarter in which Verdejo first complained to Campos.

97.     In the following quarter, Q4 of 2016-17 (August, September, and October 2017),

HP Inc. provided just $43,850 worth of credit notes (excluding the credit note previously arranged

by Wilson Leung). In the next three quarters, HP Inc. continued to retaliate Etertin by reducing the

credit notes it provided to the following amounts: $50,850 (November and December 2017,

January 2018), $7,100 (February, March, and April 2018), and $21,100 (May, June, and July

2018).

98.     On or about July 12, 2018, Etertin's U.S.-based attorney corresponded with HP

Inc.'s attorney by email and explained:

> "We have been more than patient notwithstanding that HP has not restored Etertin
> to its prior status or offered it comparable terms during the pendency of your
> investigation – something that at a minimum is guaranteed by HP's
> whistleblower/non-retaliation policy. We have been offered NO explanation as to
> why HP is refusing to restore Etertin or any estimate of how long it will take HP
> to make what is a very simple decision: will HP stand by its non-retaliation policy
> or not. Please advise when we can expect to hear from you or HP regarding our
> request that it be restored. If HP has decided not to agree to restore Etertin, please
> advise the basis for that decision. Further, please advise the status of the
> investigation and any corrective or other actions that have been taken as a result
> of our client's complaints to HP. We understand that HP has terminated the
> employment of one of the individuals our client implicated in criminal conduct,
> but as yet have heard nothing from either you or HP."

99.     On or about July 18, 2018, HP's attorney responded by email, citing that "HP policy

requires that promotional rebate programs are offered to similarly situated resellers on equal terms"

and denying that Etertin was "being offered less favorable commercial terms by HP Argentina

than similarly situated resellers in Argentina."

100.    Despite HP's attorney's assurances that Etertin was being treated similarly to other

Argentine HP resellers, the retaliation persisted. Over the next four quarters, HP provided Etertin

the following amounts of credit notes: $42,100 (August, September, and October 2018), $13,500

(November and December 2018, January 2019), \$12,850 (February, March, and April 2019) and \$900 (May, June, and July 2019).

101.    The loss of credit notes crippled Etertin in two ways: first, Etertin's sales of HP products plummeted because it could not apply credit notes to reduce the product price to remain competitive with Etertin's competitors (which did have credit notes); second, Etertin's lack of sales prevented it from paying HP Inc. for the products bought on credit, leading to ever increasing debt.

102.    From the start of the retaliation in July 2017 until it suspended operations in 2019, Etertin wire transferred in excess of \$6.8 million dollars to HP Inc. to pay for HP products. Because of the retaliation, Etertin lost millions of dollars in discounts and was forced to overpay HP for product. Eventually, due to rising debt caused by the retaliation and lack of access to HP products, Etertin filed for insolvency in Argentina and was forced to enter bankruptcy on or around August 21, 2019.

103.    HP Inc.'s participation in the extortion scheme was critical to the success of the scheme.  Without HP Inc.'s retaliatory action, HP Inc. and the Individual Defendants would not be able to continue to extort money from the Argentine distributors of HP products and maintain discipline.  HP Inc's retaliatory action was intended to convince Plaintiffs to resume the extortionate payments or serve as an example for the remaining distributors that complaints about the Individual Defendants' illegal conduct would not be tolerated.

## COUNT I

VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(c)
(Against All Defendants)

104.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1–103 in their entirety as though fully set forth in this cause of action.

105.    Defendants' unlawful acts violated 18 U.S.C. § 1962(c), thereby giving rise to a claim for relief under 18 U.S.C. § 1964(c).

106.    Plaintiffs Etertin and IVEO Latinamerican Trading LLC are legal enterprises engaged in, and whose activities affect, interstate and foreign commerce.  All Plaintiffs are persons within the meaning of 18 U.S.C. § 1961(3).

107.    All Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

108.    From in or about 2010 to the present, in the Southern District of Florida and elsewhere, Defendants HP, Inc., Gonzalo Giazitzian, Juan Campos, Carlos Huergo, Ernesto Blanco, Javier Alberto Mazzeo, Sergio Venier and others constituted   an association in fact enterprise ("the Enterprise") for the common purpose of unlawfully obtaining money from Plaintiffs and other Argentine distributors of HP products with their consent induced by the wrongful use of threats that if Plaintiffs and other distributors did not pay, Plaintiffs or the other distributors would lose HP's business. Defendants then made good on those threats in 2017 by withholding millions of dollars in HP credit notes when Plaintiffs refused to continue to make extortion payments. Defendants each had defined roles in operating or aiding and abetting the Enterprise. Defendant HP Inc. knowingly allowed HP Argentina and the Individual Defendants to use the credit notes that Argentine distributors of HP's products, like Plaintiffs, needed to survive in the market, to exert control over them.  Defendant HP Inc. benefited financially from the sale of HP products in Argentina and allowed the Individual Defendants to wield this authority over Plaintiffs any way they wanted, included extortion, as long as HP's products continued to be sold in Argentina.

109.    Knowing that a portion of the credit notes were being diverted to the officers and former officers of HP Inc.'s wholly owned Argentine subsidiary, HP Inc. withdrew and continued

to withhold such incentives to either force Etertin to resume paying or to push Etertin out of the market entirely and thereby make an example out of Etertin to enforce compliance from its other Argentine distributors.

110.   Defendants Gonzalo Giazitzian, Carlos Huergo, and Javier Mazzeo each threatened to retaliate against Plaintiff Etertin if they were not paid a portion of the financial incentives HP provided to Plaintiff Etertin. Because of these threats, Plaintiffs began paying, and continued to pay, millions of dollars to Defendant Giazitzian both for his own personal benefit and for the benefit of Campos, Huergo, Ernesto Blanco, Javier Alberto Mazzeo, and Sergio Venier (the "Individual Defendants").

111.   Defendants Campos, Huergo, Blanco, Mazzeo and Venier not only received from Giazitzian the payments they knew to be extorted from Argentine distributors such as Etertin, but they also used their authority and power and agreed with HP Inc. to grant credit notes and other financial incentives to those distributors who would pay them kickbacks and have HP Inc. withhold and withdraw credit notes and other financial incentives to those distributors who refused to pay the kickbacks.

112.   Plaintiffs were not Defendants' only victims; Defendant Giazitzian demanded and obtained extortionate payments from multiple HP distributors in Argentina and Defendants used the issuance or non-issuance of credit notes to determine which entities would serve as HP distributors in Argentina and which would not.

113.   Defendants HP Inc., Gonzalo Giazitzian, Juan Campos, Carlos Huergo, Ernesto Blanco, Javier Alberto Mazzeo, and Sergio Venier are culpable persons distinct from the association in fact enterprise (the "Enterprise") they formed.

114.     Throughout its existence, the Enterprise engaged in, and its activities affected, interstate and foreign commerce. The Enterprise involved commercial activities across state lines, such as the shipment of HP products from various warehouses in different states to the warehouse Etertin used in Florida before arranging to ship HP products from Florida to Argentina. The Enterprise also involved commercial activities across state lines because one of its members demanded and secured the wire transfer of payments sent from bank accounts in Florida to bank accounts in New York. Finally, the Enterprise's ultimate retaliation against Plaintiffs for failing to continue to pay the extortionate payments and reporting the extortion conduct to Defendant HP Inc. involved commercial activities across both state lines and countries because HP's withholding of credit notes on file in the United States forced Plaintiff Etertin to pay HP Inc. millions of dollars more  for HP products in the United States and ultimately caused Plaintiff Etertin's inability to continue to purchase HP products.

115.     Defendants conducted the affairs of the enterprise through a pattern of racketeering activity.

116.     As detailed above in paragraphs 1-103, in 2010, Defendants Giazitzian, Huergo and Mazzeo first approached Plaintiff Verdejo (and through him, Verdejo's company, Etertin) and threatened to shut off Etertin's access to HP products if Verdejo did not agree to pay a portion of credit notes. Several times, Defendant Giazitzian, on behalf of and in furtherance of the extortion scheme, made demands for payment to Plaintiff Verdejo (and at least one occasion, another distributor of HP product in Argentina) while in the Southern District of Florida, in violation of Title 18, United States Code, Section 1951. These threats, and Plaintiff's ultimate acquiescence and payment, affected interstate or foreign commerce. Defendant Giazitzian also traveled in foreign commerce from Argentina to the Southern District of Florida to facilitate the promotion,

management, establishment, or carrying on, of the unlawful extortionate activity, in violation of Title 18, United States Code, Section 1952.

117.    Plaintiffs first suffered a "domestic injury" in the United States from the extortionate demands for payment of kickbacks of the credit notes on February 10, 2017, after Defendant Giazitzian demanded, again in violation of Title 18, United States Code, Section 1951, that Etertin send a payment to Giazitzian's bank account in the United States.

118.    Days after arranging for the wire transfers of $414,209 from Plaintiff IVEO Latinamerican Trading LLP to Giazitzian's United States bank account from February 10, 2017 to June 22, 2017, Plaintiff Verdejo communicated to Defendant Campos that he would no longer make any more extortionate payments. Defendant HP Inc., Campos, and others unknown at this time then retaliated against Plaintiffs, in violation of Title 18, United States Code, Section 1951, by withholding from Plaintiffs millions of dollars' worth of credit notes maintained on Defendant HP Inc.'s computer systems in the United States, causing further domestic injury to Plaintiffs by increasing the amount Plaintiffs had to pay Defendant HP Inc. in the United States for HP product.

119.    As described in above, Defendants engaged in at least two (2) predicate acts over the last ten (10) years. These acts included, but are not limited to: 1) Defendants Giazitzian, Huergo and Mazzeo's 2010 demand of Plaintiff Verdejo (and through him, Verdejo's company, Etertin) for a portion of credit notes and Defendant Giazitzian's subsequent demands for payment while in the Southern District of Florida in 2014 and 2015, and the later receipt of extortionate payments by Giazitzian, Mazzeo, Huergo, Blanco, Campos and Venier, in violation of Title 18, United States Code, Section 1951;  2) Defendant Giazitzian's similar demands of other distributors of HP products in Argentina, and the later receipt of extortionate payments by Giazitzian, and some or all of the individual Defendants, in violation of Title 18, United States Code, Section 1951; 3)

Defendant Giazitzian's travel to the United States to facilitate the promotion, management, establishment, or carrying on of extortionate acts in April 2014, December 2014 and December 2015, in violation of Title 18, United States Code, Section 1952; 4) Defendant Giazitzian's February 2017 demand for extortionate payments to be sent to his United States bank account, the acquisition of seven (7) separate payments by Giazitzian in New York on February 10, 2017, March 16, 2017, May 1, 2017, June 2, 9, 19, and 22, 2017, and the distribution and receipt of the payments by the Individual Defendants, in violation of Title 18, United States Code, Sections 1951, 1956(h), and 1957; and 4) all Defendants' 2017-2019 retaliation against Plaintiffs for refusing to continue the extortionate payments by the withholding by HP Inc. of credit notes Plaintiffs could access in the United States, in violation of Title 18, United States Code, Section 1951.

120. In addition, to make their scheme more effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. § 2.

121. Defendants' predicate acts of violations of the Hobbs Act (18 U.S.C. § 1951), Travel Act (18 U.S.C. § 1952) and money laundering statutes (18 U.S.C. §§ 1956, 1957) were committed through the use of facilities of interstate or foreign commerce with the intent to facilitate violations of these statutes, and had the same purpose, participants, victims, and methods of commission.

122. Defendants' unlawful scheme was also executed by use of the wires. Defendant Giazitzian used the wires to make extortionate demands on both Plaintiffs as well as other similarly situated Argentine distributors. At least some of these communications were made while Giazitzian was physically in the Southern District of Florida in December 2015.

123.    These communications furthered Defendants' scheme, which occurred over the course of several years between at least 2010 and 2019.

124.    Defendants' commission of predicate acts spanned multiple years, were related in purpose, results, participants, victim, and methods of commission, and constitute a pattern of racketing activity pursuant to 18 U.S.C. § 1961(5). Defendants' plan to extort and extortion of other Argentine distributors of HP products pose a threat of continued criminal activity extending indefinitely into to the future.

125.    Defendants are each culpable persons under RICO because they violated, conspired to violate, or aided and abetted the violation of the statute. All Defendants are individuals or corporate entities capable of holding legal or beneficial interests in property.

126.    Each Defendant intended to, and did in fact, engage in the alleged predicate acts with knowledge that the conduct was illegal.  Defendants Giazitzian, Huergo, and Mazzeo acted with intent to extort payments from Plaintiffs in violation of the Hobbs Act, and all Defendants acted with intent to violate the Hobbs Act by either receiving payments known to be extorted or by agreeing to and withholding credit notes to retaliate against Plaintiffs for refusing to make additional extortionate payments. Defendant Giazitzian acted with specific intent to travel to the United States to engage in extortive conduct, in violation of the Travel Act. The Individual Defendants received money in 2017 they knew to be the proceeds of the extortion scheme and thus acted with intent to violate the federal money laundering statutes.

127.    Plaintiffs' domestic injuries to its business and property in the form of the 2017 extortionate wire transfers to the Defendants and the subsequent loss of access of millions of dollars' worth of credit notes are a direct, proximate result of Defendants' predicate acts and violations of 18 U.S.C. § 1962(c). Had Defendants not retaliated against Plaintiffs by withholding

credit notes, Plaintiffs would still be in business today and would be purchasing millions of dollars' worth of HP products in the United States. Defendants' racketeering activity is the but-for and proximate cause of Plaintiffs' damages.

**COUNT II**
CONSPIRACY TO COMMIT RACKETEERING
18 U.S.C. § 1962(d)
(Against All Defendants)

128.    Plaintiffs repeat and incorporates by reference the allegations in paragraphs 1–127 in their entirety as though fully set forth in this cause of action.

129.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the affairs of an enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. Defendants agreed to the overall objectives of the scheme to pay bribes and extort money from Plaintiffs and then retaliate against Plaintiffs when Plaintiffs refused to pay additional extortion payments. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d); thereby giving rise to a claim for relief under 18 U.S.C. § 1964(c).

130.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured and suffered financial loss in its business and property.

**COUNT III**
AIDING AND ABETTING VIOLATION OF RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT
18 U.S.C. §§ 2, 1962(c)
(Against Defendant HP Inc.)

131.    Plaintiffs repeat and incorporates by reference the allegations in paragraphs 1–130 in their entirety as though fully set forth in this cause of action.

132.    Defendant HP Inc. aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme to extort payments from Plaintiffs and other Argentine distributors of HP products under threat of losing the ability to distribute HP products in Argentina.

133.    Defendant HP Inc. had knowledge of the extortion scheme by HP Argentina's former and current officers and, rather than put a stop to the scheme and restoring the credit notes provided to Plaintiffs, continued the withdrawal and withholding of the credit notes, and thereby provided substantial assistance toward the commission of the scheme.

134.    Defendant HP Inc. aided and abetted and shared the intent to aid and abet a scheme to violate 18 U.S.C. § 1962(c), specifically, a scheme to extort payments from Plaintiffs and other Argentine distributors of HP products under threat of losing the ability to distribute HP products in Argentina; thereby giving rise to a claim for relief under 18 U.S.C. § 1964(c).

135.    As a direct and proximate result of Defendant HP Inc.'s aiding and abetting of predicate acts of a Section 1962(c) RICO violation, Plaintiffs have been injured and suffered financial loss in its business and property.

## COUNT IV
VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
Fla. Stat. § 501.201 et. sq.
(Against Defendant HP Inc.)

136.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1–103 in their entirety as though fully set forth in this cause of action.

137.    Sections 501.201, et seq. of the Florida Statutes, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), prohibit "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Fla. Stat. 501.204(1), and provide a private cause of action, to include actual damages, attorneys' fees and court costs for consumers who have suffered a loss as a result of a violation of the Act.

138.    Plaintiff Etertin is a "consumer" within the meaning of Section 501.203(7) of the FDUTPA. From 2012 until 2019, Etertin obtained HP products from HP/HP Inc., when HP/HP Inc. shipped HP products to warehouses Etertin maintained in Miami-Dade County, Florida. Etertin then paid for these products by sending, via wire transfer, funds for the benefit of HP/HP Inc.

139.    From 2012 until 2019, Etertin would calculate the amount it sent to HP/HP Inc. by reviewing the cost and applying credit notes it had on file on HP/HP Inc.'s computer servers. These credit notes were regularly provided to Etertin; in the ten quarters immediately preceding June 2017, HP/HP Inc. provided, on average, $960,718 dollars' worth of credit notes to Etertin per quarter.

140.    From 2012 until 2019, HP/HP Inc. maintained an office in Miami-Dade County, Florida, and Etertin's wire transfers for payment of product reflected HP/HP Inc.'s Miami-Dade County, Florida address.

141.    Immediately after Plaintiff Verdejo complained of extortionate payments to Defendant Juan Campos, HP Inc. ceased issuing credit notes that served to lower the price of the HP products Etertin acquired in Miami-Dade County.

142.    HP Inc.'s conduct in withdrawing and withholding credit notes was retaliatory, and constituted an unfair method of competition, unconscionable act or practice, or unfair act or practice in the conduct of any trade or commerce, as defined by FDUPTA.

143.    Even after Verdejo provided HP Inc. with evidence of the extortionate payments and explained why HP Inc.'s decision to withhold and withdraw the credit notes was unfair retaliation, HP Inc. persisted in its retaliatory conduct.

144.    The withholding and the withdrawal of the credit notes had a significant effect on Etertin's and HP Inc.'s commerce in the State of Florida.  Without the credit notes, Etertin took delivery of HP products in Miami-Dade County, Florida that were grossly inflated in price.

145.    As a direct and proximate result of HP Inc.'s unlawful practices in violation of FDUTPA, Etertin has incurred substantial actual damages by purchasing and taking delivery of the grossly overpriced HP products.

146.    Accordingly, Etertin is entitled to actual damages in an amount to be determined at trial, as well as reasonable attorneys' fees and costs.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants in favor of Plaintiffs as follows:

a.   Awarding damages on all Counts, trebled pursuant to law as to Counts 1-3;

b.   Awarding costs and reasonable attorneys' fees;

c.   Awarding prejudgment and post-judgment interest; and

d.   Ordering such other and further relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  February 1, 2021

Respectfully submitted,


/s/ Adam S. Fels

Adam S. Fels
afels@ffslawfirm.com
Daniel Fridman
dfridman@ffslawfirm.com
Alejandro O. Soto
asoto@ffslawfirm.com
Fridman Fels & Soto, PLLC
2525 Ponce de Leon Boulevard
Suite 750
Coral Gables, FL 33134
tel.: (305) 569-7701
fax: (786) 627-4145

*Counsel for Plaintiffs Diego Damian Verdejo,*
*Etertin, S.A., and IVEO Latinamerican Trading*
*LLC*