UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: **21-20431-CIV-SCOLA/GOODMAN**

**DIEGO DAMIAN VERDEJO,
ETERTIN S.A., AND
IVEO LATINAMERICAN TRADING LLC,**

        **Plaintiffs,**

v.

**HP INC.,
GONZALO GIAZITZIAN,
JUAN MANUEL CAMPOS,
CARLOS HUERGO,
JAVIER ALBERTO MAZZEO,
ERNESTO BLANCO,
and SERGIO VENIER,**

        **Defendants.**
_____/

**PLAINTIFFS' RESPONSE TO HP'S MEMORANDUM OF LAW**

Adam S. Fels
Florida Bar No. 114917
afels@ffslawfirm.com
Daniel Fridman
Florida Bar No. 176478
dfridman@ffslawfirm.com
Alejandro O. Soto
Florida Bar No. 0172847
asoto@ffslawfirm.com

FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Boulevard
Ste. 750
Coral Gables, FL 33134
tel.: (305) 569-7701
fax: (786) 627-4145
*Counsel for Plaintiffs Diego Damian
Verdejo, Etertin, S.A., and IVEO
Latinamerican Trading LLC*

Plaintiffs Damian Diego Verdejo, Etertin S.A., and IVEO Latinamerican Trading LLC ("Plaintiffs") submit this Response to HP's Memorandum of Law (DE 73).

## BACKGROUND

1. Plaintiffs filed this action on February 1, 2021. Complaint (DE 1). The Complaint alleges, among other things, that Defendants participated in a civil RICO scheme by which the "Individual Defendants" (Giazitzian, Campos, Huergo, Blanco, Mazzeo, and Venier) extorted a portion of discounts called credit notes provided by Defendant HP Inc. to Plaintiff Etertin, and that Defendant HP Inc., knowing about the extortion of the notes, ultimately withdrew and withheld credit notes to Etertin in 2017 after Plaintiff Verdejo complained about the extortion. Complaint (DE 1). The Complaint also alleged a civil RICO conspiracy, aiding and abetting the RICO enterprise, and a violation of the Florida Deceptive and Unfair Trade Practices Act. *Id.*

2. The key allegations relevant to the discovery hearing are: (a) HP Inc. admitted prior involvement in bribery by its foreign subsidiaries in 2014 when it entered into a Non-Prosecution agreement with the DOJ and SEC, id., ¶¶ 2-5; (b) HP failed to enhance its compliance programs and internal controls to detect and prevent widespread extortion and encouraged the illegal extortion payments id., ¶ 6; (c) in 2012, HP changed the method by which Argentine distributors such as Plaintiff Etertin obtained HP products – shifting the responsibility for importation of HP products from HP to the distributors, id., ¶¶ 41-42; (d) from 2012 on, distributors could use credit notes provided by HP to reduce the price of HP goods purchased in the United States and exported to Argentina, id., ¶¶ 42-43; (e) from 2011 until 2017, the Individual Defendants extorted from Etertin a portion of the credit notes issued by HP, and these extortion payments – primarily to Defendant Giazitzian but shared with others -- continued even after Giazitzian left HP's Argentine subsidiary in April 2016, id., ¶¶ 49, 53-54; (f) shortly after Plaintiff Verdejo complained to

Defendant Campos about the extortion, Campos caused HP to retaliate by causing HP to withhold the credit notes that Etertin needed to compete with other HP distributors, id., ¶ 80; (g) HP benefitted from the credit note scheme through the sale of HP's products in Argentina while also exerting control over the distributors who received the notes, id., ¶ 108; (h) the Individual Defendants agreed with HP Inc. to grant credit notes and other financial incentives to those distributors who would pay them kickbacks and have HP Inc. withhold and withdraw credit notes and other financial incentives to those distributors who refused to pay the kickbacks, id., ¶ 111; and (i) Defendants agreed to the overall objectives of the scheme to pay bribes and extort money from Plaintiffs and then retaliate against Plaintiffs when Plaintiffs refused to pay additional extortion payments, id., ¶ 129.

3. In its Motion to Dismiss, HP incorrectly asserted that Plaintiffs conceded that HP did not learn about the extortion scheme until 2017 and argued that it did not have a common purpose of the scheme under 2017. Mot. to Dismiss (DE 49) at 16. Plaintiffs countered that the Complaint alleged HP knew about the scheme at least as early as 2017, and undoubtedly earlier because HP's agreement with DOJ required it to enhance its compliance program and monitor the activities of its foreign subsidiaries from 2014 onward. Resp. (DE 52) at 2-3. HP also sought dismissal of the Complaint by arguing that Plaintiffs failed to show how HP and the Individual Defendants shared a "common purpose to engage in a particular fraudulent course of conduct." DE 49 at 15.  Plaintiffs responded that the credit note scheme between HP and the Individual Defendants allowed HP to benefit financially from the sale of HP products in Argentina while at the same time exerting greater control over the distributors receiving the credit notes. DE 52 at 10.

4. On August 4, 2021, Plaintiffs served a request for production on HP seeking, among other things, documents that would allow them to determine what HP knew about the broad credit

note scheme alleged and when it knew it, what role HP had in devising or participating in the overall 2011-present scheme, and how HP stood to benefit. Following discussions between the parties, HP Inc. refused to turn over documents to 32 out of Plaintiffs' 62 requests, and it submitted on October 5, 2021, a privilege log listing nearly as many documents (308) as HP had actually produced (330). Notably, neither the 308 documents nor five additional large categories of documents on the privilege log contain an adequate description of the "undisclosed communications in a manner that allow[s] the [opposing party] and the district court to evaluate [the] claimed privilege." *Johnson v. Gross,* 611 Fed.Appx. 544, 547 (11th Cir. 2015), even after this particular issue was brought to HP's attention and HP revised its log.

## ANALYSIS

Plaintiffs' outstanding requests seek documents relevant to its claim of HP's participation in the 2011-to-present extortion scheme alleged or to HP's defenses that it was unaware of the scheme until 2017 and that it shared no common purpose with the Individual Defendants. Plaintiffs seek documents within the timeframe of the alleged credit note scheme relating to:

(1) efforts to comply with its 2014 settlement with the DOJ and SEC (**Requests #22-26, 62**), relevant to the allegations in paragraphs ¶¶ 2-6, 111, as well as HP's defense regarding lack of knowledge of the scheme until 2017. For documents submitted to or shared with DOJ or SEC, Plaintiffs limit their request to documents from 2011-2018 that relate to its Argentine subsidiary. Any statements to the DOJ or SEC about the existence (or lack thereof) of bribery, fraud or extortion at its Argentine subsidiary (particularly after HP's 2014 settlement with DOJ and SEC and its pledge to enhance internal controls) would be probative of knowledge and intent.

(2) information exchanged with external auditors concerning the 2014 settlement and any other allegations of bribery, fraud or extortion (**Requests # 28-30**), also relevant to the

allegations in paragraphs ¶¶ 2-6, 111, as well as HP's defense regarding lack of knowledge of the scheme until 2017. Again, for documents submitted to or shared with external auditors, Plaintiffs limit their request to documents from 2011-2018 that relate to its Argentine subsidiary. Any statements to auditors about the existence (or lack thereof) of bribery, fraud or extortion at its Argentine subsidiary (particularly after HP's 2014 settlement with DOJ and SEC and its pledge to enhance internal controls) would be probative of knowledge and intent. As the case HP cites makes clear, any information HP shared with DOJ or SEC lost its privileged nature, *SEC v. Herrera*, 324 F.R.D. 258, 263 (S.D. Fla. 2017), so any materials that HP shared with both the DOJ and SEC and their external auditors could not be privileged.

(3) the decision to switch responsibilities for importing from HP Argentina to the distributors like Etertin, what effect a change in the Argentine law in 2012 (creating an authorization knows as a DJAI) had on this decision, the decision to incentivize distributors to obtain these DJAIs through the issuance of additional 15% credit notes, and what HP knew about what these credit notes were being used for, including bribes (**Requests # 38-53**); relevant to the allegations in paragraphs 6, 40-41, 43, 108, and 129 as well as HP's defenses regarding lack of common purpose and lack of knowledge of the scheme until 2017. Again, these 15% credit notes were all issued during the extortion scheme and were among the credit notes generally alleged to have been subject to extortion demands.

(4) the decision or proposal to continue providing discounts under the SIMI program (**Request # 54**), use other discounts ("White Box") (**Request # 36)** or other discounts, benefits or incentives following Verdejo's complaint about the extortion in 2017 (**Request # 37)**; relevant to the allegations in paragraphs 6, 40-41, 43, 108, and 129, as well as the allegation that the scheme continues to the present day and involves continued extortion of other distributors indefinitely into

the future, Complaint, ¶ 124, as well as to address HP's stated defense that HP withdrew and withheld the credit notes used in the extortion scheme after Verdejo's 2017 complaint because Etertin was not entitled to them. HP Memo of Law (DE 73) at 2, Mot. to Dismiss (DE 49) at 1. If HP continued providing discounts (albeit in different form) to Etertin's competitors, then it is more likely that the withdrawal and withholding of credit notes was, as Plaintiffs allege, retaliatory.

(5)     <u>Documents collected during any internal investigation of Verdejo's 2017 complaint or any investigation into bribery, extortion or money laundering allegedly committed by employees or contractors of HP's Argentine subsidiary</u> (**Requests # 18, 20, 21**), relevant to the allegations in paragraphs 2-6, 40-41, 43, 108, 111, and 129, and, to the extent there were complaints predating Verdejo's, relevant to HP's defense of lack of knowledge of the scheme until 2017.

(6)     <u>Emails to or from any of the Individual Defendants referencing either "Etertin" or "Verdejo"</u> (**Request # 61**, as voluntarily limited by Plaintiffs), relevant to the Individual Defendants' knowledge of and participation in the alleged scheme, and, to the extent that the Individual Defendants communicated with HP employees, relevant to HP's knowledge and participation in the alleged scheme.  These communications are particularly relevant as Plaintiffs have alleged that HP withdrew and withheld credit notes within weeks after Verdejo complained to Campos in June 2017, Complaint, ¶¶ 80, 98, yet HP's internal investigation (which concluded that Defendant Sergio Venier had demanded and received at least $130,000 from Etertin and ultimately led to Venier's firing) did not conclude until May 2018. Decl. of Maria Artucovich and Exhibits (DE 70-1), at 2, 22. Given this timeline, it is apparent that HP withdrew and withheld the credit notes from Etertin ***well before*** it conducted an investigation, and Plaintiffs are entitled discovery on the circumstances of HP's decision to withdraw and withhold the credit notes.

Dated: October 13, 2021                                    Respectfully submitted,

*/s/ Adam S. Fels*
Adam S. Fels
Florida Bar No. 114917
afels@ffslawfirm.com
Daniel Fridman
Florida Bar No. 176478
dfridman@ffslawfirm.com
Alejandro O. Soto
Florida Bar No. 0172847
asoto@ffslawfirm.com

FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Boulevard
Ste. 750
Coral Gables, FL 33134
tel.: (305) 569-7701
fax: (786) 627-4145
*Counsel for Plaintiffs Diego Damian Verdejo, Etertin, S.A., and IVEO Latinamerican Trading LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was provided via CM/ECF to all counsel of record on October 13, 2021.

                                                              */s/ Adam S. Fels*